I'm Christopher Sproul, attorney for Plaintiff Appellant Ecological Rights Foundation. May it please the Court. I'd like to begin with a discussion of our Clean Water Act claim and the District Court's dismissal of our Clean Water Act claim. And the District Court's dismissal was premised on a fundamental misunderstanding of our complaint. And I would urge the Court, direct the Court's attention to paragraphs 19 and 3 of our Second Amendment complaint, which the District Court clearly overlooked. The District Court found that we had alleged that stormwater is not collected or channeled and then discharged, but, quote, rather runs off and dissipates in a natural and unimpeded manner, and therefore is not a point source discharge. Mr. Sproul, let me ask you a question about that. As I read the motion to dismiss the Second Amendment complaint below, it proceeds on that theory, that what you're alleging in this case is just purely a stormwater discharge case, water flowing down from the poles into water. And as I read your response to the motion to dismiss, it doesn't say what you're now saying. It doesn't say, well, that's part of our claim, but we're also making a culvert collection claim or a direct deposit into the waters of the United States claim for those few poles that are in marshes, et cetera. Is that a fair characterization of the motion and the response? No, Your Honor. Both our opening brief and our reply brief make crystal clear that we're claiming that there was the paragraphs 19 and 3. I understand the reference isn't a complaint, and I'm having a difficulty with the opening and reply brief. The other side filed a motion to dismiss, right? The other side filed a motion to dismiss. You filed a response to that motion to dismiss. We did. And then the other side filed a reply. And so I was focusing on your response to the motion to dismiss. I'm focusing on this from the perspective of the district judge. Did you ever tell the judge in your response to the motion to dismiss, that you're now arguing to us? We have these theories where you're now arguing to us. We didn't flesh out that argument below. It's true. Well, no, I mean, not just flesh it out. You're saying your complaint also alleges direct discharge and conveyed stormwater allegations. I don't see where you made that argument in the district court. I believe that we did not give that argument the exposition that it deserved. That's true. But where did you make the argument? Did you give it any? Did you make it at all? I believe that we didn't really make that argument. See, I'm trying to look at this from the perspective of the district judge, who you're now saying made a terrible mistake. He should have gone back through your complaint and back through your papers filed with the EPA and realized you were arguing a different theory than the one that you posed to him. You never asked to amend the complaint, you know, to make this clear. So the question isn't whether or not you could have made this claim below or whether or not I might divide it from your complaint, but did you waive it by not urging it to the district judge? Well, the court, the cases that we cite repeatedly throughout the opening brief and reply brief underscore that dismissal is not to be granted without leave to amend unless it's clear. But you never asked for leave to amend below. You never said below, oh, now I see the problem. These guys think we're alleging a pure stormwater theory. That's a complete mischaracterization of our complaint. We have a different theory. What you said below is you're right. We are urging a stormwater theory, and by God, it's a good one. And that's a fair thing to take up to us. But I'm having difficulty saying to the district judge, boy, you made a terrible mistake. The plaintiff never told you he was arguing this theory. You should have figured it out on your own and allowed an amendment that he wasn't asking for. The district court judge below was a she, Your Honor. I know. I know. But I'm being politically incorrect. I always use the masculine for the indefinite. I'm okay with that. Judge Callahan can kill me on that if she wants to. The question is, we don't need, we are not seeking an order. We need this Court to chastise the district court for having, quote, unquote, gotten it wrong. But what we need is justice to be done. And the cases that we cite in our brief are clear that unless it's clear that leave to amend cannot, is not available to cure a defect in the pleading, then it's improper to grant dismissal without leave to amend. Mr. Schroll, I am always concerned as a judge with what the ramifications are going to be if I rule one way or the other in a case. And I just want to make sure I understand. Your theory seems to be that each individual poll is a point source. Is that correct? Yes. Each individual. That's not our only theory, but that is a theory. And if that's the case, that each poll then requires a separate NPDES permit?  No, Your Honor. And it's very common for, and actually the State of California, which has delegated authority under the Clean Water Act to issue NPDES permits, National Pollutant Discharge Elimination System permits, the basic Clean Water Act permit. The State of California has issued a general permit for stormwater discharges. And there are a variety of them. But I'm also troubled by the implications of your argument. If you're right, isn't an NPDES permit required for every preservative-treated utility pole, park bench, railroad tie, house, deck, backyard fence? I mean, haven't Congress and the EPA recognized that stormwater requires a more measured approach? But the language of the statute must be respected and given effect. And it says discharge from an industrial source. Okay. But if we say that, how is stormwater runoff from a utility pole outside of my house associated with industrial activity that is directly related to manufacturing, processing, or raw material storage of an industrial plant? What about the runoff from my wooden mailbox? Well, your wooden mailbox wouldn't count because it's not an industrial activity. So that's the heart of it, assuming that you're limited to the stormwater discharge theory. We're not now dealing with culverts or other things. Don't you have to establish that the runoff comes from an industrial source, industrial activity? Yes. And hasn't the EPA? With respect to stormwater, Your Honor. With respect to stormwater alone. Yeah. With respect to the pure stormwater theory. And with respect to the pure stormwater theory, I've just read the EPA's brief in the Supreme Court in the Decker case. It seems to me what they're saying is we haven't gotten around to this yet. We haven't – their definition of industrial activity just doesn't seem to pick up what this is. So are you arguing that the EPA should have regulated this but hasn't, or are you arguing that they have regulated it? I'm sorry. The latter part was – Are you arguing that the EPA has regulated this specific type of activity, or are you arguing that they should have? More the former, Your Honor. They haven't specifically asserted jurisdiction over utility poles. That's true. And we have to conclude that, as Judge Callahan said, that this is industrial activity related to whatever the rest of the rank says. Right. And I'd like to answer that question about the distinction about park benches and so on, and isn't this sort of, say, the parade of the horribles, and now everything in the universe must be regulated. Well, I think there is a distinction between a park bench is probably not going to be seen realistically by anyone as an industrial activity, a mailbox, your own private mailbox on your personal property. Well, we never thought a utility pole was either. Well, I guess we have. Yes, you have. Well, again, I can't see how a colorable argument can be made that a park bench is an industrial activity, but with respect to an industrial and with respect to a utility pole, I do have what I think is more than a colorable argument that that's an industrial activity. A utility pole grid, a utility pole is part of a grid that delivers electricity to millions of customers. There are hundreds of thousands of these. Millions of them. Millions. To say that this kind of activity is not an industrial activity, when here you have electric power plants, those are clearly industrial activities. No one would take issue with that. Mr. Sproul, what do we do with the fact that EPA specifically exempted major electrical power line corridors from the definition of industrial activity? Doesn't that necessarily include the subsidiary utility poles that distribute electricity to the ultimate consumers? There's an EPA guidance document, but not an official EPA action in terms of a regulation. I mean, at most, that EPA guidance document would be entitled to some sort of skidmore deference to the extent it's got the ability to persuade. It's not a self-law. But you're standing in the shoes of the EPA here, suing somebody for something that the EPA has pretty clearly implied it doesn't regard as within industrial activity. Right? They've said major power lines are not within industrial activity, and you're dealing with something smaller. Don't we have a problem with that? Well, again, it's an EPA guidance document, and if this Court were not to say, well, we're going to defer to the EPA guidance document, it wouldn't be the first time in the stormwater area that this Court has declined to follow. And it might not be the first time that we got slapped down. I mean, that's really the way I'm asking this question. I think what you're really saying on your CWA stormwater claim is the EPA should be regulating this stuff, but it isn't. And can you allege that in a citizen's suit, or do you have to go sue the EPA? Well, EPA itself says we can. The Solicitor General's brief in the Decker case says that – and Decker, of course, was brown. And it says that jurisdiction to challenge EPA's interpretation of the silvicultural rule and the stormwater rule was appropriate. Well, let's assume that you can challenge it, but on the fact that the EPA isn't coming in here – you know, maybe they've got a lot of other things to do, but they're not supporting you in an amicus brief in your position, right? We haven't asked. But they know how to do it if they want to. Amicus by its absence is the Environmental Protection Agency from this case. Yeah, on one side or the other. So I think it would be speculative to try to read what's EPA's view with respect to these. That's why we have citizen suits, so that people can step in when they're too busy. Well, I think that's true. And I think Brown, among other decisions, recognizes that. Well, let's – since we have Brown, Decker at the Supreme Court, but we only need to wait for that if we buy into that you should be able to allege the direct discharge and conveyed stormwater allegations, correct? I'm sorry. Can you repeat the question? Well, we were just asking you, did you ever make the arguments in the district court about direct discharge and conveyed stormwater allegations? You said no, you didn't, but you meant to or whatever. If – why – if in coming to our decision, if we think you waive that and it's not here as part of this lawsuit, do we need to wait for Brown and Decker? Do we need to wait for a ruling in Decker? Yes, for us to decide this case. Well, a ruling on Decker could have some importance for the Klum-Waddock section 402P arguments, I think, in particular. But I think the – How so? Well, the – in Brown, this Court held that it was inappropriate for EPA, impermissible under the statute for EPA not to regulate an industrial source of stormwater discharge. One of the issues that is up on appeal, or certiorari has been granted on, is whether it was appropriate to be able to raise that question in a citizen suit. Well, if I were going to predict, I think Brown's going to get reversed. But that being said, but how do we need to wait for that for this? Well, like I said, if the Supreme Court, in the course of ruling on that particular question presented, might give some guidance on how 402P is to be interpreted, that seems to be at least a possibility. You've got only a few minutes left, and I suspect you want to save some of them. So can I ask you to turn to your RCRA claim? Yes. In order for there to be a RCRA claim, there must be a disposal of solid waste, right? Yes. And unfortunately, the statute defines solid waste as something that is discarded. So it's sort of a circular definition. But tell me why PCP leaching, if you will, or coming off these telephone poles into the ground is a disposal of waste. Yes, Your Honor. I think that the leading case here is Carson Harbor. And Carson Harbor makes plain that a legal analysis that the district court clearly failed to follow. Carson Harbor says that we reject the active-passive dichotomy. I put aside active-passive for a second. Why is this waste? I agree that one need not actively dispose of waste in order to qualify for RCRA. But tell me why it's waste. Yes. And the waste, and it's important to identify what is the waste. The waste is the oil pentachlorophenol mixture which has leaked or spilled out of the utility pole and is in the ground or in the water surrounding the pole. It's no longer inside the pole. It's left the pole where it was contained and kept out of the environment and is now in the environment. I think that's directly analogous to like the situation in Zans or in some of the Court of Appeals decisions like Waste Industries and others that were discussed in the Carson Harbor case, that when you have material that's been contained and kept out of the environment, moving from a place where it has been contained outside of the environment and moving into the environment, even if that's done passively, that's the disposal of solid waste. What relevance, if any, does FFRA have on this? None, Your Honor. There's a controlling, at least two controlling Ninth Circuit cases. One is actually issued by the Fifth Circuit, but it was in a multi-circuit case. That's the Cotton case that's referred to in our reply brief. And the other is the Headwaters case decided by the Ninth Circuit that holds that compliance with FFRA is no defense to Clean Water Act liability. It just seems to Clean Water Act, and I understand the Clean Water Act issue, but I'm now focusing on RCRA, which requires that something be waste. And it seems kind of strange for the EPA to say, we're okay with you putting this on telephone poles up to a certain level, knowing, of course, that inevitably it will come off of the poles in that level and into the environment, on the one hand in FFRA, and then on the other hand in RCRA saying, but we'll sue you if it actually comes off the poles. I understand there's no preemption there, but is this an affirmative defense that they might raise? No, again, under these controlling Ninth Circuit precedent, it's not an affirmative defense. I mean, you still must comply with the Clean Water Act, and ultimately with RCRA. I can't see any principle reason to say, well, there's no affirmative defense under the Clean Water Act, but there would be one. But I guess if something's used for its intended purposes, how could it be discarded? Well, again, if you had a leaking underground storage tank full of FFRA pesticide and it leaked out of that underground storage tank, and, you know, you had a FFRA license to be storing the pesticide, well, you still disposed of it, and that's a violation of the law. And the whole RCRA, again, RCRA's concern, the citizen supervision that we're relying on, is concerned with the imminent and substantial endangerment. But you'd still have to prove that. You'd still have to prove that. If you went to trial and they showed that the amount of PCP that went into the environment was not environmentally dangerous, because I assume they might be able to come in and show that the EPA didn't regard this amount as environmentally dangerous. But your argument for purposes of this was the motion to dismiss is that it's not preemptive. Yes. Yes. Do you want to save some time for Ruba? Yes, please. Okay. Let's hear from the utilities. May it please the Court. I'm Doug Sullivan. I represent the Apelli Defendant Pacific Bell Telephone Company. And if I might make one prefatory comment, yesterday, Judge Callahan, I heard you say you wanted the litigants to focus on what the case was about. And so it's clear what this case is about. In the second amended complaint and in the notice letter giving rise to this lawsuit, ERF claims that, quote, every single pole, each and every single wooden pole in the four counties surrounding the San Francisco Bay violates the two Federal statutes at issue here, statutes enacted decades ago. And they seek in their prayer for relief the removal of every single pole. Well, let me just ask you this about Georgia Pacific and Decker. In terms of, in order, from your perspective, and I was trying to ask the same question of the Foundation, we have a number of ways that this case could go, and there's different places you can hop off or stay on.  And if we did, what would we have to decide in order to make it relevant? You absolutely do not have to wait. And the reason for my preface was to show how this is an improper collateral attack on EPA's rulemaking and its definition. EPA has decided in its definition of what is associated with an industrial activity to define a variety of things, which does not include the poles at issue. So it is very clear here that under the EPA definition, I'll just read it to you, it is any conveyance that is used for collecting and conveying stormwater, and that is directly related to manufacturing, processing, or raw material storage areas at an industrial plant. The poles are not an industrial plant. The poles have nothing to do with manufacturing, processing, or raw materials. Thus, EPA, which was given discretion by Congress to define industrial activity, has chosen to define it in such a fashion that the poles are absolutely not regulated. Second thing EPA did is it assigned SIC codes, standard industrial classification codes, to particular activities that they felt were industrial in nature. And there is no SIC code whatsoever governing the poles. Scalia. Look, I think that's all correct, and let's assume it's all true. But Judge Callahan's question was should we wait for Decker? Because in Decker, as I understand it, the issue was whether or not one could attack the validity of an EPA regulation without the EPA being a party in this instance. Gershengorn And let me address that. Scalia. Isn't what they're really doing here attacking your definition of industrial activity? They're saying it's not broad enough. It should include our poles. So why isn't this exactly the same issue that is raised in Decker and Brown? Gershengorn Very different. In Brown, as you recall in the decision, the 2011 decision, after there was an issue raised about jurisdiction, it was in the opinion that it was undisputed that the logging roads were industrial activity. The only issue, therefore, at that stage was can they exempt it under the silvicultural rule? Very different from our case. We never get to the Clean Water Act ever applying because there is no industrial activity. And, again, Congress left it to EPA to define that. So what they're really doing is now making a collateral attack on EPA's definition of what is an industrial activity. And there is no — once the Court concludes, which I think it must, that EPA has not included the poles as industrial activity, there is no jurisdiction here. Well, what if we, just hypothetically, what if we said that the complaint also contains direct discharge and conveyed stormwater allegations? Would Georgia-Pacific have any impact there, or Decker, if we said that? I'm just asking you to go there hypothetically. I hate that hypothetical, but, no, Brown dealt with stormwater discharges. Our case deals with stormwater discharges. As you just postulated, and I saw it raised in their papers on appeal for the first time, that there's three or four poles allegedly in the waters that are unassociated with stormwater discharges. Actually, if you look at their notice letter, that's inaccurate. But, to your point, yes, if they were not alleging stormwater discharges, Brown wouldn't be applicable, and we would not be in the situation where we're talking about the no application because of industrial activity. Nevertheless, we'd still have another argument, why the CWA does not apply, and that's the point source argument. We would still contend that they are not point sources, even if directly in the water. But we would only get to that if we concluded they were related to industrial activity. Yes, that's correct. And if I can go back to why there's no jurisdiction, since they're not related to industrial activity, the citizens' action suits are under 1365A.1, and it has to be with respect to a violation of an EPA limitation. There is no EPA limitation that can be violated. Hence, there is no basis for the citizens' action suit once you decide that, in fact, it's not industrial activity and, therefore, not governed by EPA. The other cases, the Brown case, for example, there was already stipulated that it was an industrial activity and they were saying you were violating the permit for industrial activity and it was inappropriate to exempt it. Very different. Can I ask you, if you would, to address the Rickler claim? Yes. And let me pose a hypothetical to you. So it's hypothetical. You don't need to tell me that's not the case here. Let's assume that you put way too much PCP on these polls, and as a consequence of putting too much PCP on these polls, some of it leaked into the ground. Would they, would the EPA or a citizen be able to pursue a Rickler claim against you? No. Why not? And the answer is, under the Hines case of the Ninth Circuit, the Court filed a majority of courts that said you have to have, and I'll quote it, the vast, quote, the vast majority of courts that have considered the issue read Rickler to require affirmative action rather than merely passive conduct. Well, that can't be right, can it? If you had an underground storage tank with gasoline in it and it leaked, wouldn't that violate Rickler? In the case they cited, the Sands case, which was decided well in advance of the Hines case, it was found by the Southern District of California to be the case. But in that case, it's your case. Is your position that that's no longer good law, that one can, if one, if there's passive leaking out of a storage facility, that that doesn't violate Rickler? In that case, the underground storage tank, I'd say yes, but it doesn't matter for this purpose, because in that case, the distinction is you have a situation where daily operations, daily control of the container that's designed to contain the pollutants, that's its function, that's being used daily with the pollutants. It's very different. Well, the Act says, I mean, if you put, and again, I'm positing that you just way over PCP these polls. You put too much in them. And by the way, I think that's a fair reading of one of their allegations. They said we went near one of the polls and we measured levels of PCP and we thought they were extremely high. And you're saying you can do that at will without any Rickler liability? Now I must take exception with your hypothetical. The manufacturing of this is tightly controlled by EPA, and we'd ask the courts to do that. I understand, but this is a complaint. We're at the motion-to-dismiss stage. And so they've alleged that somehow something went wrong here. There's a whole bunch of PCP going into the ground from these polls. And you're saying it doesn't matter. It's not waste. Is that right? Is that your position? Our position is it's not a person for liability under RCRA. There's a couple operative terms that are very important. You have to contribute in any way to? Pacific Bell would have to be contributing to the disposal of a solid waste, contributing under the Hines case. And that's a phrase that does not exist in CERCLA, which is the Carson Harbor case, by the way. The Carson Harbor case is a CERCLA case that does not involve the interpretation of contribute. CERCLA is a strict liability statute without that requirement. So I understand your position. Your position is that RCRA requires active, active disposal by the liable party. This Court in the Hines case was very clear about that. So you believe that all the underground storage tank cases are wrong because there is no active disposal in those cases? That's not our case here, but I believe you can say in those cases, in fairness to ERF, you can say in those cases there is some active conduct because they have designed, developed a container that is meant to contain the pollutants on a daily basis while they're pumping in, pumping out with connections and the like. Very different. That's a gas station with an underground storage tank. Did the district court dismiss the RCRA claim on the ground that PGD and PAC Bill had not contributed to the disposal of the waste? Or if it didn't, could it have? We have two operative terms that the district court dealt with, both of them. One of the operative terms is contribute, which requires affirmative conduct rather than merely passive conduct. The second one, again, not under CERCLA, is solid waste. And solid waste is defined as garbage, refuge, sludge or other discarded material. But what was the district court ground? It was both, on both contribution and solid waste. So why isn't this discarded material? Discarded material? They discarded all. Again, does that require active conduct, in your view? Yes, it does, Your Honor. And that is different than the Carson Harbor case and different than what you asked about before. You said, why isn't this a disposal? Disposal is very broadly defined. You were correct about that. And it's broadly defined in CERCLA and RCRA alike. But there's an element here of solid waste that requires discarded material. And what this Court said in safe air, the term solid waste refers to materials that are, quote, truly discarded, disposed of, thrown away or abandoned. The Court went on. It said it means, quote, cast aside, rejected, abandoned or given up. Why isn't the PCP that leaches, for example, off the poles, abandoned, discarded, given away? I mean, you're not reusing it. Those cases were all about this notion that if you reuse this product, it's not discarded. It doesn't fall within the solid waste definition in RCRA. But I take it what you're saying, and maybe it's a position that's correct, is that we could put anything on these poles in whatever amount, and if it leaks into the ground, it's not the disposal of solid waste. Is that your position? May I offer three responses to that? Sure. But can you answer it? Can you give me a yes or no to my question? The answer is yes. Okay. I think I got that right. So let's take their argument. It's dripping down. It's now around the ground. Is it still serving its intended function? Absolutely. It's right there. It's preventing fungicide. It's preventing insecticide right where it's supposed to be, at the ground level, where you have that concern. Now let's assume, okay, you've now got some stormwater that's come. It's separated somewhat. So at least the product is no longer, the PCP is no longer serving the function of a fungicide or insecticide. At that stage, there's no affirmative conduct that's been involved at all. There's no true discarding, casting aside, abandoning that's required. So that's point one. Point two. Well, is the case that you mentioned, does that squarely hold that discarded requires some affirmative act? Does it squarely hold that, or is that just the inference? Hines does. Yes, Your Honor. And it squarely holds that. It says discarded material requires an affirmative act. Absolutely. Yes. Affirmative conduct, not passive conduct. Flat out says that, the Hines case. And that's distinguishable from the Carson Harbor case, again, where under CERCLA, you can have slight passive, where the court was dealing with a passive active under CERCLA, using the word disposal, not discarded, not contribution. But there's a second thing. This case is not about a little bit of drips and grabs around the telephone poles. If you read the notice letters, let's talk about what they really say. They say each and every pole is bad because each and every pole uses PCP, end of discussion. That's what the regulatories were put on notice of. Millions of poles. That's what they were put on notice of. Not a particular pole in a particular location where you might have a little bit of separation or something like that. And so why is that significant? What it really means is, let's talk about what's going on here. What's really going on is, this is a collateral attack on FFRA. Now, I'm not saying FFRA and the EPA. But this is a motion to dismiss. Right. And I'm not saying under FFRA that this is preemption. But what FFRA shows, in particular for the Clean Water Act and the EPA's approval of PCP and poles under the Clean Water Act, what it's showing is, not only did EPA not choose to regulate these poles as industrial activity, but on the contrary, EPA chose affirmatively to sanction the use of PCP in these poles. And if this Court were to adopt the view that RCRA liability could apply here or there. Well, but it might be an affirmative defense if all of your poles complied with FFRA. But that's not we're nowhere near that stage of the case. I'm not saying that, Your Honor. We asked for judicial notice to be taken of FFRA for purposes of showing that EPA has sanctioned the use of it rather than regulating it as industrial activity. We weren't arguing preemption. We weren't arguing. But that's a Clean Water Act argument. Right. Okay. Right. Can I get back to Hines? Because I'm having trouble reading Hines to say what you think it says. Hines involves a guy who buys a piece of property, and the pollutants are already in the ground. And after he buys the property, the pollutants continue to seep through the ground. And the Court says, you didn't do anything. You just owned a property. You didn't contribute to this problem in any way. So how does that cover a case where you affirmatively put these poles in the ground? I think that's Carson Harbor, Your Honor. Hines' case involved a manufacturer of a dry cleaning machine that was designed specifically to funnel PCE, what's trichloroethylene, which is a dry cleaning fluid, right out of the machine, down the sewers that were known to leak. And if you looked at the complaint, and this is evident from the Court's discussion, that the claim against that manufacturer was, you knew this was going in the sewers, you knew this was going to leak, you designed this thing, that was active conduct, and you designed this thing. But he had no control over the disposal of waste at the time it was being disposed of, correct? Exactly. And in your case, don't you have control over the disposal of the – assuming this is disposal at the time it's being disposed of? The manufacturer had lost control of the machine at that point. Somebody else owned it. But you continue to own these telephone poles. So how does Hines deal with your situation? There's no question we continue to own or PG&E continue to own them. But the difference is there's no active affirmative conduct in connection with the discarding of waste at that time. And if you were to adopt that conclusion, it would have enormous consequences. For example, ERF tomorrow could sue thousands and thousands of businesses, thousands and thousands of homeowners for the same sorts of violations. And remember, their allegations are dust when a squirrel goes up the poles, when somebody goes and attacks something on a telephone. That's not what Rick – on a telephone pole. That's not what Rick was intended to govern. And the amici brief in this case, the KMG and American Coke and Coal, they lay out the horrific things that would happen from there. That's why I asked Mr. Sproul, because it seems to me that every railroad tie on every line of railroad, every retaining wall in somebody's backyard, there's just no end to it. If we – I mean, it seems to me it's an issue that ought to be raised either with the EPA or Congress. Exactly. And, Judge Hurwitz, I didn't mean to ignore your question. No, no. No, you didn't ignore my question. In Hines, they not only was it different factually, but the Court was very clear in laying down clear guidelines as to what affirmative conduct is required. And it did follow a number of other cases. Contrast that with their cases. So your argument is there's no active human involvement here with the waste? That's correct. Right. And I take it, and this is why your position gives me some pause, is I take it you really think the gas tank cases are wrongly decided. You've done a yeoman-like job of trying to suggest why there's active involvement. But if I just put a bunch of gas in a tank to store for future use and it leaks out, it's hard for me to see how I'm acting actively, how there's active conduct there. I do think there is a big distinction, because it's constant use, constant piping. And in that case, it wasn't just the, you know, underground tank. It was the entire operation of the gas tank. No, and I realize that's the case. Yes. But I'm positing there's just a, I decide I want to store a bunch of gas on my property and use it sometime in the future. If it leaks, do I have worker reliability? Right. If I might go back to you. Well, Mr. Sullivan, let me just add, you have reserved, I thought, three minutes for Mr. Roach. And are you going to eat up all of his time or are you going to yield the podium? I would love to. I know you would love to. I'm just asking the question. He got the wave. PG&E. Okay. He's on a roll. Let him go. All right. I'll take that as a waiver. A wise associate counsel. Go ahead. At the very beginning, you asked about the new theory. And let's face it, it's a new theory for the Clean Water Act. It's about direct discharges. That was never raised below before the district court. You can look at the opposition. Never once suggested. They've been, therefore, those arguments are waived under the A1 ambulance case in the Ninth Circuit. Nor can they now seek to amend based upon these new allegations. The Allen and Vincent cases we cite make that very clear. But let me be very specific. The second amended complaint, paragraphs 50 and 51 of the Clean Water Act, they talk only about stormwater discharges, nothing else. If you also look at the notice letter, which is a jurisdictional prerequisite, and this really goes to both the RCRA claim and the Clean Water Act claim. It's a jurisdictional prerequisite. That's the Center for Biological Diversity, and I believe it's the broad case for RCRA. They're jurisdictional in nature. And what were they put on notice of here? They were put on notice that every poll is bad. But the notice letter, if you look for Clean Water Act, Exhibit B, that is described as, quote, a list of a subset of polls from which stormwater has discharged, end of quote. Exhibit C lists the dates of the violations. What are the dates of the violations? When it rains. Only stormwater was alleged. And with respect to RCRA, that was not noticed to the government or to us that a couple of particular polls may be problematic because you've got a little drippings around it. That was, hey, we don't like PCP and polls. We don't like that EPA approved this under FIFRA. That's what this case is about. Thank you. Yes, to respond to the contentions that what we're offering is an improper collateral attack, again, as I pointed out earlier, EPA has filed an amicus brief or a brief from the Solicitor General indicating that there was jurisdiction in Brown to challenge an EPA interpretation of its regulation, and we're just doing the same thing here. And it's also, it's unremarkable. There's plenty of press. Are you challenging the EPA's interpretation of its regulation, or are you saying that you're within the regulation? Well, only when it comes with respect to Clean Water Exception 402P argument and the storm exemption for stormwater. Yeah, just the plain stormwater discharge. Right, right. And we're potentially at odds with EPA's interpretation. EPA made plain in its preamble statement accompanying the adoption of its stormwater regulation that, well, we're exempting some activity that clearly would be industrial. We've put this in our brief. And this Court's decision in Brown, which is still good law, says that you can't do that. And it's super precedent. It's precedent on precedent saying that EPA does not have the discretion to exempt. Yeah, but what Judge Callahan asked at the beginning, I guess I come back to, if that's really your argument, then shouldn't we wait until to see what the Supreme Court does with Decker and Brown? I don't care. The Solicitor General sometimes does the right thing. Yeah, that may be appropriate. We've also, I mean, we would ask, actually, in the first instance, that you remand the whole 402P issue down to the district court, which would probably moot that out because we'd have a ruling by the Supreme Court while the 402P issue was before the district court. Because the district court didn't rule on the 402P issue. It dismissed the case on the finding that there was no point source discharge and that utility poles aren't point sources and didn't reach the alternative argument raised in the defense. Issue. The industrial activity issue. So we would urge that that issue should be remanded to the district court. But isn't that purely a question of law? No. No, I think there are issues of fact bound up in that question. The what is the SIT code assignment? There are three criteria under EPA stormwater regulation for identifying an activity as an industrial activity subject to NPDES regulation. First, does it fall within certain SIC codes? Second, is it within EPA's F1 guidelines? And third, does it fall within a list of narrative categories? PG&E has made much in their brief that we're Group 49, Group 49 under the SIC code. Therefore, we're not regulated because Group 49 is not an SIC code that's called out in EPA's regulation. Well, as we put material along with our reply brief that shows, request for judicial notice, that there are numerous, numerous facilities in California that self-identify themselves as being Group 49 facilities that have applied for coverage under the state of California's general industrial stormwater permit. The categorization of an industry into what SIC code is appropriate is an extremely complex matter. The SIC manual goes on for page after page and identifies multiple factors to consider in deciding what's the proper SIC code to be assigned to a facility. No government agency assigns SIC codes. It's up to PG&E to self-identify what's its SIC code. And actually, this court has held that self-identifying what's appropriate clean water regulation in the stormwater area is improper and invalidated EPA's Phase 2 stormwater regulation on that basis. You are out of time. Thank you. The case just argued is submitted, and we'll get you a decision when we can. Thank you very much, Your Honor. Thank you. We are adjourned for the day. Thank you.
judges: Tallman, Callahan, Hurwitz